13 CIV    407

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HEATHER M. EARLE, HENRYK MALINOWSKI, LINDA CARR and ERIC FRIEDMAN, on behalf of themselves and all others similarly situated,<br><br>       Plaintiffs,<br><br>v.<br><br>BANK OF AMERICA CORP., BANK OF AMERICA, N.A., THE BANK OF TOKYO – MITSUBISHI UFJ LTD., BARCLAYS BANK PLC, CITIGROUP, INC., CITIBANK N.A., CREDIT SUISSE GROUP,AG, COÖPERATIEVE CENTRALE RAIFFEISEN-BOERENLEENBANK B.A., DEUTSCHE BANK AG, HBOS PLC, HSBC HOLDINGS PLC, HSBC BANK PLC, JPMORGAN CHASE & CO., JPMORGAN CHASE BANK, N.A., CHASE BANK USA, N.A., THE NORINCHUKIN BANK, LLOYDS BANKING GROUP PLC, ROYAL BANK OF CANADA, ROYAL BANK OF SCOTLAND GROUP PLC, and UBS AG,<br><br>      Defendants. | Case No.<br><br>JURY TRIAL REQUESTED |

## CLASS ACTION COMPLAINT



RECEIVED

JAN 17 2013

U.S.D.C. S.D. N.Y.
CASHIERS

## TABLE OF CONTENTS

INTRODUCTION..................................................................................................1

JURISDICTION AND VENUE.............................................................................2

THE PARTIES.......................................................................................................4

      Plaintiffs.........................................................................................................4

      Defendants.......................................................................................................6

NATURE OF THE ACTION.................................................................................8

CLASS ACTION ALLEGATIONS.....................................................................15

STATUTE OF LIMITATIONS AND EQUITABLE TOLLING........................17

VIOLATIONS OF ANTITRUST LAWS SECTION 1 OF THE SHERMAN ACT...........20

DEMAND FOR JURY TRIAL............................................................................21

PRAYER FOR RELIEF.......................................................................................21

Plaintiffs, Heather M. Earle, Henryk Malinowski, Linda Carr and Eric Friedman ("Plaintiffs"), by and through undersigned counsel, on behalf of themselves and all others similarly situated, allege as follows:

## INTRODUCTION

1.      Plaintiffs bring this suit against Bank of America Corp., Bank of America, N.A., Bank of Tokyo-Mitsubishi UFJ Ltd., Barclays Bank plc, Citigroup, Inc., Citibank N.A., Credit Suisse Group, AG, Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A., Deutsche Bank AG, HBOS plc, HSBC Holdings plc, HSBC Bank plc, JPMorgan Chase & Co., Chase Bank USA, N.A., The Norinchukin Bank, Lloyds Banking Group plc, Royal Bank of Canada, Royal Bank of Scotland and UBS AG ("Defendants") for their violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, arising from Defendants' collusive manipulation and fixing of the six-month and twelve-month U.S. Dollar ("USD") London InterBank Offered Rate ("LIBOR") from at least January 2008 through the present (the "Class Period").

2.      Since its inception in approximately 1986, LIBOR has been the benchmark interest rate used in financial markets around the world.  Mortgage rates, credit cards, student loans, and other loans often use LIBOR as a reference rate.  Additionally, futures, options, swaps, and other derivative financial instruments traded in the over-the-counter market and on exchanges worldwide are tied to LIBOR.  In essence, it is the primary benchmark for short-term interest rates globally.

3.      LIBOR, which is published under the authority of the British Bankers' Association (the "BBA"), is defined by the BBA as the rate at which an individual contributor panel bank could borrow funds, were it to do so by asking for and then accepting interbank offers in reasonable market size, just prior to 11 a.m. London time.

1

4.     Plaintiffs' claims arise from loan transactions where the interest rate was indexed to six-month USD LIBOR or twelve-month USD LIBOR, including but not limited to adjustable rate mortgages.  The number of homeowners impacted by Defendants' wrongful manipulation number in the millions.  For example, Lender Processing Services, Inc. which collects data on approximately two-thirds of all residential mortgages, has found that almost forty-five percent of all prime adjustable rate mortgages are linked to six-month USD LIBOR; and, for subprime loans, the number is closer to eighty percent.

5.     The LIBOR rate-fixing conspiracy perpetrated by Defendants has cost American homeowners *billions* of dollars on their mortgages.  Indeed, Robert Shapiro, the former Under Secretary of Commerce for Economic Affairs in the Clinton administration and now chairman of the economic consulting firm Sonecon, LLC, estimates that LIBOR was off by an average of 30-40 basis points, which would have added, for example, $300 to $400 to the annual cost of a $100,000 loan.  As Mr. Shapiro has explained, "If the bankers' manipulations of the LIBOR was responsible for raising LIBOR rates by just 20 basis points in that period [*i.e.,* approximately *half* of the amount of Mr. Shapiro's estimate of the amount of manipulation], *their shenanigans added between $6.6 billion and $8.9 billion to the yearly interest paid by American homeowners*."  Plaintiffs seek to recover the amount of overpayments that resulted from Defendants' conspiratorial manipulation of the LIBOR rate.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, which authorize a plaintiff who was damaged by any violation of the antitrust laws of the United States to bring suit in any court of the United States having

2

jurisdiction over the parties for injunctive and equitable relief, and under Sections 1331 and 1337 of the United States Judicial Code, 28 U.S.C. §§ 1331 and 1337.

7.     Venue is proper in this District pursuant to Sections 4(a), 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15(a), 22, and 26, and pursuant to Sections 1391(b), (c), and (d) of the United States Judicial Code, 28 U.S.C. § 1391(b), (c), and (d).  One or more of the Defendants resides, is licensed to do business, is doing business, transacts business, is found, or has agents in this District; a substantial part of the events giving rise to Plaintiffs' claims occurred in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

8.     Personal jurisdiction over each of the Defendants is proper in this District pursuant to Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22, in that each of the Defendants resides, is found, transacts business, or has an agent in this District.

9.     Personal jurisdiction over each of the Defendants is also proper in New York in that the claims asserted here arise from one or more of the following acts:

        a.     Each of the Defendants, in person or through an agent, transacts business within New York or has consented to supply services in New York; or

        b.     Each of the Defendants, in person or through an agent, has committed a tortious act within New York; or

        c.     Each of the Defendants, in person or through an agent, committed a tortious act outside New York causing injury to persons or property within New York and regularly does or solicits business in New York; or

        d.     Each of the Defendants, in person or through an agent, committed a tortious act outside New York causing injury to persons or property within New York; each

3

expected or should reasonably have expected the act to have consequences in the State of New York; and each derived substantial revenue from interstate or international commerce.

10.     The activities of the Defendants and their co-conspirators were within the flow of, and were intended to, and did, have direct, substantial and reasonably foreseeable effects on the interstate commerce of the United States.

## THE PARTIES

### Plaintiffs

11.     Plaintiff Heather M. Earle is an individual who resides at 33 Eastman Street, Dorchester, Massachusetts.  On or about February 4, 2004, Ms. Earle entered into an adjustable real estate mortgage transaction for that property with Option One Mortgage Corporation located at 3 Ada, Irvine, CA 92618.  Under the terms of the mortgage agreement, the mortgage rate was tied to the six-month USD LIBOR rate.  More specifically, Ms. Earle's loan agreement provided: "The interest rate I will pay may change on the first day of March 01, 2006 and on that day every sixth months thereafter.  Each date on which my interest rate could change is called a 'Change Date'."  The loan agreement further provided:  "Beginning with the first change date, my interest rate will be based on an Index.  The 'Index' is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*."

12.     Plaintiff Henryk Malinowski is an individual who resides at 154 W. 18th Street, New York, NY 10011.  On or about October 19, 2005, Mr. Malinowski entered into an adjustable real estate mortgage transaction for that property with United States Trust Company of New York, 114 West 47th Street, New York, New York, which, in 2007, was acquired by Bank of America Corporation.  Under the terms of the mortgage agreement, the mortgage rate

4

was tied to the one-year USD LIBOR rate annually beginning on December 1, 2010.   More specifically, Mr. Malinowski's loan commitment provided, "Commencing in the **sixth** year of the loan your interest rate will be adjusted annually based on the One Year LIBOR as published in The Wall Street Journal, Eastern Edition, +2.25% per annum for the remainder of the loan term."   His promissory note further provided, "The interest rate on this Note is subject to change from time to time based on changes in an independent index which is the ONE YEAR LONDON INTERBANK OFFERED RATE (LIBOR) AS PUBLISHED TUESDAY IN THE MONEY RATES SECTION OF THE WALL STREET JOURNAL, EASTERN EDITION, TRUNCATED TO THE THOUSANDTH DECIMIAL PLACE."

13.   Plaintiff Linda Carr is an individual who resides at 11 Jones Landing, Unit A, Walpole, Massachusetts 02081.   On or about May 12, 2006, Ms. Carr entered into an adjustable real estate mortgage transaction for that property with WMC Mortgage Corp., 3100 Thornton Avenue, Burbank, California 91504.   Under the terms of the mortgage agreement, the mortgage rate was tied to the six-month USD LIBOR rate and was subject to adjustment beginning on the first day of June 2008 and on that day every sixth months thereafter.   Each date on which the interest rate could change was called the "Change Date."   The mortgage agreement further provided, "Beginning with the first Change Date, my interest rate will be based on an Index.   The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR") as published in *The Wall Street Journal.*"

14.   Plaintiff Eric Friedman is an individual who resides at 130 Crafts Street, Newton, Massachusetts 02460.   On or about April 13, 2004, Mr. Friedman entered into an adjustable real estate mortgage transaction for that property with HSBC Mortgage Corporation (USA), 2929 Walden Avenue, Depew, New York 14043.   Under the terms of the mortgage agreement, the

5

mortgage rate was tied to the one-year USD LIBOR rate and was subject to adjustment beginning on the first day of May 2009 and on that day every twelve months thereafter.  Each date on which the interest rate could change was called the "Change Date."  The mortgage agreement further provided, "Beginning with the first Change Date, my adjustable interest rate will be based on an Index.  The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR") as published in *The Wall Street Journal.*"

**Defendants**

15.     Defendant Bank of America Corporation is a Delaware corporation headquartered in Charlotte, North Carolina.  Defendant Bank of America, N.A. — a federally-chartered national banking association headquartered in Charlotte, North Carolina — is an indirect, wholly-owned subsidiary of Defendant Bank of America Corporation. Defendants Bank of America Corporation and Bank of America, N.A., are referenced collectively in this Complaint as "Bank of America."

16.     Defendant The Bank of Tokyo – Mitsubishi UFJ Ltd. ("BTMU") is a Japanese company headquartered in Tokyo, Japan.

17.     Defendant Barclays Bank PLC ("Barclays") is a British public limited company headquartered in London, England, United Kingdom.

18.     Defendant Citigroup, Inc. is a Delaware corporation headquartered in New York, New York. Defendant Citibank, N.A. — a federally-chartered national banking association headquartered in New York, New York — is a wholly-owned subsidiary of Defendant Citigroup, Inc.  Defendants Citigroup, Inc. and Citibank, N.A. are referenced collectively in this Complaint as "Citibank."

19.     Defendant Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A. ("Rabobank") is a financial services provider headquartered in Utrecht, the Netherlands.

20.     Defendant Credit Suisse Group AG ("Credit Suisse") is a Swiss company headquartered in Zurich, Switzerland.

21.     Defendant Deutsche Bank AG ("Deutsche Bank") is a German financial services company headquartered in Frankfurt, Germany.

22.     Defendant HSBC Holdings PLC is a United Kingdom public limited company headquartered in London, England. Defendant HSBC Bank PLC — a United Kingdom public limited company headquartered in London, England — is a wholly-owned subsidiary of Defendant HSBC Holdings PLC. Defendants HSBC Holdings PLC and HSBC Bank PLC are referenced collectively in this Complaint as "HSBC."

23.     Defendant JPMorgan Chase & Co. is a Delaware corporation headquartered in New York, New York. Defendant JPMorgan Chase Bank, National Association — a federally-chartered national banking association headquartered in New York, New York — is a wholly-owned subsidiary of Defendant JPMorgan Chase & Co. Defendant Chase Bank USA, National Association — a Delaware federally-chartered national banking association headquartered in New York, New York — is a wholly-owned subsidiary of Defendant JPMorgan Chase & Co. Defendants JPMorgan Chase & Co., JPMorgan Chase Bank, N. A., and Chase Bank USA, N. A. are referenced collectively in this Complaint as "JPMorgan Chase."

24.     Defendant Lloyds Banking Group plc ("Lloyds") is a United Kingdom public limited company headquartered in London, England. Defendant Lloyds was formed in 2009 through the acquisition of Defendant HBOS plc ("HBOS") — a United Kingdom banking and insurance company headquartered in Edinburgh, Scotland — by Lloyds TSB Bank plc.

25.     Defendant The Norinchukin Bank ("Norinchukin") is a Japanese cooperative bank headquartered in Tokyo, Japan.

26.     Defendant Royal Bank of Canada ("RBC") is a Canadian company headquartered in Toronto, Canada.

27.     Defendant The Royal Bank of Scotland Group plc ("RBS") is a United Kingdom public limited company headquartered in Edinburgh, Scotland.

28.     Defendant UBS AG ("UBS") is a Swiss company based in Basel and Zurich, Switzerland.

29.     Defendants Bank of America, BTMU, Barclays, Citibank, Rabobank, Credit Suisse, Deutsche Bank, HSBC, JPMorgan Chase, Lloyds, HBOS, Norinchukin, RBC, RBS and UBS were members of the BBA USD LIBOR contributor panel during the relevant period.

30.     Various other entities and individuals not named in this Complaint have participated as co-conspirators in the acts complained of herein and performed acts and made statements that aided, abetted and furthered the unlawful conduct alleged.

## NATURE OF THE ACTION

31.     LIBOR is an interest rate that is commonly used as a benchmark for a wide variety of financial products and securities worldwide.  It purportedly represents the interest rate at which banks are able to borrow unsecured funds from other banks.  Each business day at 11:00 a.m. London time, the designated banks that comprise the contributor panel report their borrowing costs to the BBA.  The BBA places the reported rates in order and excludes the top and bottom quartile.  It then averages the remaining rates to obtain LIBOR.  This process is undertaken for different maturities that range from overnight to twelve months.  A total of 150 LIBOR rates are calculated each banking day (*e.g.*, overnight U.S. Dollar LIBOR, 1 week Yen

LIBOR).

32.     Thomson Reuters calculates and publishes the rates each business day by approximately 11:30 a.m. London time.  The published rates are made available worldwide by Thomson Reuters and other data vendors through electronic means and through a variety of interstate communications sources.

33.     Each contributor panel bank must submit its rate each day in theory without reference to rates contributed by other contributor panel banks.  The basis for a contributor panel bank's submission, according to the BBA, must be the rate at which the members of the bank's staff who are responsible for management of the bank's cash, rather than for management of the bank's derivative trading book, assess the bank's costs to borrow unsecured interbank funds in the London money market.  Further, according to the BBA, a contributor panel bank may not contribute a rate based on the pricing or fixing of any derivative financial instrument.  In other words, a contributor panel bank's LIBOR submissions should not be influenced by its motive to maximize profit or minimize losses in derivative transactions tied to LIBOR.

34.     The contributor panel for USD LIBOR has at all relevant times been comprised of between sixteen (16) and nineteen (19) banks.  As of June 2008, the panel consisted of the following entities:

| | |
|---|---|
| Bank of America | JP Morgan Chase |
| Bank of Tokyo - Mitsubishi UFJ | Lloyds TSB Bank PLC |
| Barclays Bank PLC | Rabobank |
| Citibank NA | Royal Bank of Canada |
| Credit Suisse | Norinchukin Bank |
| Deutsche Bank AG | Royal Bank of Scotland Group |
| HBOS | UBS AG |
| HSBC | West LB AG |

35.    Throughout the Class Period, Defendants' employees conspired to, and did, manipulate LIBOR on a daily basis by agreeing on the interest rates reported to the BBA, resulting in the artificial setting of the six-month and twelve-month USD LIBOR rates.

36.    Defendants, who are each contributor panel banks (or holding companies of contributor panel banks) for USD LIBOR, knew or understood that it was common practice during the Class Period for adjustable rate loans, including mortgages, to be indexed to the  six-month or the twelve-month USD LIBOR rate and for the rate to adjust at some regular interval. Accordingly, it was not only foreseeable, but obvious, to Defendants that, by manipulating the six-month and twelve-month USD LIBOR rate, the Defendants would be able to (and did) increase the rates paid by Plaintiffs and other Class members on their adjustable rate mortgages and loans.

37.    Most adjustable rate mortgages in the United States that were indexed to LIBOR were indexed to six-month or twelve-month USD LIBOR.   These mortgages contained a standard provision defining "The 'Index'" as the average of interbank offered rates for either six-month or twelve-month USD LIBOR as published in *The Wall Street Journal*.  The indices thus quoted were identical in all substantive and pertinent regards for Plaintiffs and for each Class member.   Statistical evidence demonstrates that Defendants agreed to artificially *increase* the six-month and twelve-month USD LIBOR rate.

38.    A study published by the Federal Reserve Bank of Cleveland (the "FRBC") in October 2012 provided evidence that the six-month USD LIBOR had been agreed by Defendants beginning at least as of 2008 to be higher than it otherwise would have been.  In this study, the FRBC compared the six-month USD LIBOR to five different rates:  the Federal funds rate, the OIS-six-month rate (an overnight index swap ("OIS") is an interest rate swap in which the

overnight rate is exchanged for another fixed interest rate), the OIS-one-year rate, the Treasury-six-month rate, and the Treasury-one-year rate. The study regressed six-month USD LIBOR on each of these five alternative rates for the period January 2000 through December 2007 in order to identify the average difference between each of these rates and the LIBOR rate and to determine the degree to which LIBOR and the comparison rate moved together. The study determined that during this period (January 2000 through December 2007), the comparison rates were typically within three basis points of the six-month USD LIBOR rate (the "Predicted Differential") and that the estimated co-movements were close to one:

| Alternative | Predicted differential | Co-movement | Model fit ($r^2$) |
|---|---|---|---|
| Federal funds rate | 0.283 | 0.992 | 0.977 |
| OIS-6 month | 0.163 | 1.000 | 0.991 |
| OIS-1 year | −0.130 | 1.044 | 0.971 |
| Treasury-6 month | 0.120 | 1.057 | 0.986 |
| Treasury-1 year | −0.236 | 1.135 | 0.976 |

39.     The FRCB study found that, during the period prior to the Class Period: "The model fit for each of these alternatives is high [as reflected by the $r^2$ figure of almost one], which combined with the near-one-to-one co[-]

40.     movements and tightly estimated differentials indicates that *these rates were reliably linked prior to the financial crisis*." (Emphasis added.)

41.     Although the six-month USD LIBOR and each of these comparison rates were historically "reliably linked," the six-month USD LIBOR began to diverge dramatically up from the comparison rates beginning in 2008, as reflected in the following graph:

# Figure 1. Libor and Possible Alternatives: Selected Short−Term Interest Rates, Daily



Sources: British Bankers' Association; Bloomberg Financial Services; "Selected Interest Rates," Statistical Release H.15., Federal Reserve Board.

42.    The FRCB concluded:

Our simulations show that many Libor-linked loans would have experienced noticeably lower payments if they had been linked to either a one-year Treasury or six-month OIS index, even after these indexes are adjusted for their precrisis interest rate differentials. On average, alternative index rates would result in meaningfully lower payments for loans that were linked to Libor in 2008 even though borrowers who took out these loans would have had little reason to suspect that Libor would, at some point, diverge from Treasuries and other comparable rates, and cease to be a good reflection of low-risk borrowing rates.

43.    Similar analysis of the twelve-month USD LIBOR rate compared to the Treasury-one-year rate and the one-year service charges swap rate shows that the twelve-month USD

LIBOR rate began to diverge from those comparison rates in 2008 after closely tracking them prior to 2008.

44.     The foregoing statistical evidence of Defendants' scheme to artificially manipulate six-month and one-year USD LIBOR up is buttressed by the evidentiary record that has been developed to date as part of the numerous ongoing governmental investigations.

45.     Barclays announced on or about June 27, 2012, that it had reached a settlement agreement in relation to investigations with the United Kingdom Financial Services Authority ("FSA"), the United States Commodity Futures Trading Commission ("CFTC") and the Department of Justice ("DOJ").  Barclays agreed to pay total penalties of £ 290 million sterling ($453 million) in return for, *inter alia*, conditional leniency from the DOJ.  As part of the settlement agreement, Barclays admitted:

> Certain Barclays swaps traders made requests of traders at other Contributor Panel banks for favorable LIBOR or EURIBOR submissions from those banks. In addition, *certain Barclays swaps traders received requests from traders at other banks for favorable LIBOR* or EURIBOR submissions from Barclays rate submitters. *When Barclays swaps traders did not have trading positions conflicting with their counterparts' requests, those Barclays swaps traders sometimes would agree to request a LIBOR or EURIBOR submission from the Barclays LIBOR or EURIBOR submitters that would benefit their counterparts' positions.* Those interbank communications included ones in which certain Barclays swaps traders communicated with former Barclays swaps traders who had left Barclays and joined other financial institutions. The likelihood that the LIBOR or EURIBOR fix would be affected increased when other Contributor Panel banks also manipulated their submissions as part of a coordinated effort.

(Emphasis added.)

46.     The conclusion that the Defendants colluded to manipulate LIBOR is further supported by the nature of the LIBOR rate-setting process.  The top and bottom quartile are excluded from the calculation of LIBOR.  Thus, to manipulate the rate, a submitter would have to know the rates being submitted by the other banks, and, in particular, what the pivotal fifth

and fifteenth submissions were.  If the submitter lacked this information, it would not be able to successfully manipulate the rate, because the submission of an artificially high rate (designed to raise the average) would likely be excluded from the calculation.

47.     If a bank were agreeing to manipulate LIBOR and it knew the exact amount of the pivotal fifth and fifteenth quotes, its own quotes would tend to cluster around these pivotal quotes.  Defendants' quotes of LIBOR did cluster in this manner since at least the beginning of 2008.

48.     Investigations of all named Defendants, who comprised the USD LIBOR contributor panel during the relevant period, are ongoing in the United States, Switzerland, Japan, the United Kingdom, Canada, the European Union and Singapore by at least ten different governmental agencies, including by the DOJ, the CFTC, the Securities Exchange Commission, the FSA, the Canadian Competition Bureau, and the Monetary Authority of Singapore.  The New York attorney general has subpoenaed 16 banks over their role.  Additionally, numerous employees, including supervisors, traders, and brokers from the various financial institutions have been accused of improper conduct related to LIBOR and a number of individuals have been terminated as a result of their role in the agreement to manipulate LIBOR.

49.     These investigations show that there was a pervasive scheme to agree on a manipulation of LIBOR during the Class Period.  For example, on December 15, 2012 Bloomberg reported that UBS was expected to pay approximately $1.6 billion to settle governmental claims against it for rate fixing; the Royal Bank of Scotland was in advanced settlement talks and had stated that it expected to disclose the penalties before its next earnings release in February 2013; and Deutsche Bank had disclosed in November 2012 that it had set aside funds to cover potential fines resulting from its role in the LIBOR rate rigging scandal.

## CLASS ACTION ALLEGATIONS

50.    Plaintiffs bring this class action lawsuit on behalf of themselves and proposed Class members under Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3).

51.    Plaintiffs seek certification of the following class:

All persons and entities throughout the United States who had an adjustable rate loan mortgage or loan indexed to six-month or twelve-month USD LIBOR that was set or adjusted during the period January 2008 through the present.

52.    All Class members, including Plaintiffs, have an adjustable rate mortgage or loan agreement indexed to the six-month or twelve-month USD LIBOR, which was set or adjusted as of a specified change date during or after January 2008.

53.    The Class members are so numerous (exceeding 10,000 borrowers nationwide) that individual joinder of all members is impractical.

54.    There are questions of law and fact common to Plaintiffs and the Class, which questions predominate over any questions affecting only individual Class members and are susceptible to class-wide proof.  The principal common issues are:

   a)  Whether the Defendants conspired to fix, set, increase, make artificial, and manipulate six-month and twelve-month USD LIBOR rates;

   b)  Whether the Defendants' conduct had an anticompetitive and manipulative effect on six-month and twelve-month USD LIBOR during the Class Period;

   c)  Whether Defendants' conduct violated Sherman Act § 1;

   d)  Whether the Defendants' conduct caused Plaintiffs' and other Class members' interest rates to increase;

   e)  Whether the Defendants took steps to conceal the contract, combination or conspiracy;

   f)  Whether Plaintiffs and Class members are entitled to equitable and injunctive relief and the nature of such relief; and

15

g) The appropriate measure of damages for the injury sustained by Plaintiffs and other Class members as a result of Defendants' unlawful activities.

55.     The wrongs suffered and remedies sought by Plaintiffs and other Class members are identical, the only difference being the exact monetary amount to which each Class member is entitled, as a matter of mere arithmetic calculation.

56.     Plaintiffs' claims are typical of those of members of the Class and are based on the same legal and factual theories. Plaintiffs' claims arise from the same interest, event, pattern and practice and are based upon the same legal theory.

57.     Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have suffered economic injury in their own capacity from the practices complained of and understand the nature of their duty as representatives of the Class, the nature and extent of the claims against Defendants, and the relief available to Plaintiffs and other members of the Class. Neither Plaintiffs nor their counsel has any conflicting interests, which might cause them not to vigorously pursue this action.

58.     Plaintiffs have retained counsel with experience in federal court and complex litigation and class actions. The undersigned counsel will provide adequate representation of Plaintiffs and the Class.

59.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all class members is impracticable. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without unnecessary duplication of effort and expense that numerous individual actions would engender. The damages suffered by the individual Class members are relatively small given the expense and complexity of the claims asserted in this Complaint. Thus, absent the availability of class action

procedures, it would not be feasible for Class members to redress the wrongs done them.  Even if the Class members could afford individual litigation, the court system could not.  Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and the court system.  Therefore, the class action device presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale, and comprehensive supervision in a single court.

60.     The trial and litigation of Plaintiffs' and Class members' claims will be manageable.

61.     Certification of a class under Federal Rule of Civil Procedure 23(b)(2) is appropriate because Defendants have acted or refused to act on grounds generally applicable to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

## STATUTE OF LIMITATIONS AND EQUITABLE TOLLING

62.     Throughout the Class Period, Defendants affirmatively and fraudulently concealed their unlawful conduct against Plaintiffs and the Class.

63.     Plaintiffs and members of the Class did not discover and could not have discovered, through the exercise of reasonable diligence, which they in fact exercised, the existence of the conspiracy and Defendants' involvement in the conspiracy until at the earliest June 27, 2012, when Barclays announced that it had reached a settlement agreement in relation to government investigations into LIBOR, because Defendants and their co-conspirators actively and fraudulently concealed the existence of their conspiracy.

64.     Because Defendants' conspiracy was actively concealed until at least June 27, 2012, Plaintiffs and members of the Class were unaware of Defendants' unlawful conduct and

17

did not know that they were paying artificially high interest for their adjustable-rate mortgages and loans based on six-month and twelve-month USD LIBOR.

65.    The affirmative acts of Defendants, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

66.    Defendants agreed among themselves not to discuss publicly or otherwise reveal the nature and substance of the acts and communications in furtherance of their illegal conspiracy.

67.    Defendants conspired to share their interest rate information and falsely report interest rate information to the BBA and Thomson Reuters.  Their purpose was to manipulate six-month and twelve-month USD LIBOR to artificially higher levels and thereby maximize their profits.

68.    By its very nature, Defendants' alleged misconduct was self-concealing.  First, Defendants' actual or realistic interest rates were not public information, making any comparison to the false rates they published to the BBA, and in turn to Thomson Reuters and *The Wall Street Journal*, and any discernment of discrepancies, an impossibility.  Second, the Defendants' internal communications and communications among each other were not public information, rendering impossible any ascertainment of the specific misconduct of the individual Defendants or the conspiracy.

69.    As a result of the self-concealing nature of Defendants' collusive scheme, a reasonable person would not have previously discovered the conspiracy to manipulate LIBOR.

70.    The BBA's statements on its website that LIBOR was "[t]he rate at which an individual contributor panel bank could borrow funds, were it to do so by asking for and then accepting interbank offers in reasonable market size, just prior to 11 [a.m.] London time" was

false and known to be false by the Defendants and not corrected by the Defendants so as to mislead Plaintiffs and Class members into falsely believing that LIBOR was reliable and set by market forces.

71.     This false statement lulled Plaintiffs and members of the Class into believing that LIBOR was the normal result of competitive market forces rather than the product of collusive efforts. This statement was known by Defendants to, and did, put Plaintiffs and members of the Class off guard and cause them to accept LIBOR as their benchmark interest rate without undertaking further inquiry into its reliability. Even had such inquiry been undertaken, it would have proven futile, because Plaintiffs and members of the Class did not have access to contemporaneous information that would have allowed them to evaluate whether each Defendant had complied with the BBA's statement.

72.     Plaintiffs and members of the Class could not have discovered the alleged conspiracy at an earlier date than at least June 27, 2012, by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination.

73.     Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants until at least June 27, 2012, Plaintiffs and the members of the Class had no knowledge of the alleged conspiracy, or of any facts or information which would have caused a reasonably diligent person to investigate whether a conspiracy existed.

74.     None of the facts or information available to Plaintiffs and members of the Class prior to at least June 27, 2012, if investigated with reasonable diligence, could or would have led to the discovery of the conspiracy alleged herein prior to that date.

19

75.     Indeed, former Under Secretary of Commerce Robert J. Shapiro has called the Defendants' LIBOR manipulation the "largest consumer fraud ever seen."

76.     As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims of Plaintiffs and members of the Class as a result of the anticompetitive conduct alleged in this Complaint.

77.     Defendants are also estopped to challenge Plaintiffs' and Class members' reliance upon equitable tolling and estoppel to toll the statutes of limitation.  Having knowingly and intentionally concocted and concealed their illegal conduct, Defendants are estopped by their unclean hands to rely upon statutes of limitations that, if sustained, would reward them for their successful and continuing concealment.

## VIOLATIONS OF ANTITRUST LAWS
## SECTION 1 OF THE SHERMAN ACT

78.     Plaintiffs have standing to bring this action pursuant to Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15, because of the close physical and economic nexus between the Defendants' unlawful conduct and the tangible injury suffered by the Plaintiffs, and this action does not raise any possibility of duplicative exaction from the Defendants.

79.     Defendants' anticompetitive conduct had severe adverse consequences on the Plaintiffs by increasing the interest rate charged on their adjustable rate loans that were indexed to six-month and twelve-month USD LIBOR and caused them to suffer financial losses.

80.     Beginning at least as early as January 1, 2008, and continuing to the present, the exact dates being currently unknown to Plaintiffs, Defendants and their unnamed co-conspirators entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act.

81.     The conspiracy consisted of a continuing agreement, understanding or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants fixed, maintained, increased, stabilized or made artificial, the six-month and twelve-month USD LIBOR rates, to which Plaintiffs and the other Class members' adjustable rate loans were indexed.  Defendants' conspiracy is a *per se* violation of the federal antitrust laws and is an unreasonable and unlawful restraint of trade and commerce.

82.     Defendants' conspiracy and resulting impact on adjustable rate mortgages and other loans indexed to six-month and twelve-month USD LIBOR occurred in or affected interstate and foreign commerce.

83.     As a proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have suffered injury to their property.

84.     Plaintiffs and the Class have no adequate remedy at law and will suffer irreparable harm unless Defendants are enjoined from continuing to implement their unlawful agreement in the future and the Court remedies the conditions they created in furtherance of their conspiracy.

## DEMAND FOR JURY TRIAL

85.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all claims asserted in this Complaint so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants:

(a)     Certifying that this action may be maintained as a class action, as defined above, under Fed. R. Civ. P. 23(a), 23(b)(2) and 23(b)(3);

(b)     Appointing Plaintiffs to act as representatives of the Class members and the Class;

(c)     Appointing the undersigned counsel as Class Counsel;

21

(d)     Adjudging that the conduct described in this Complaint involved unlawful restraints of trade in violation of Sherman Act § 1;

(e)     Awarding Plaintiffs and class members appropriate compensatory damages trebled;

(f)     Permanently enjoining Defendants, together with their officers, directors, employees, agents, partners or representatives, successors, affiliates and any and all persons acting in concert with them or by agreement with them, from directly or indirectly engaging in the wrongful acts and practices described above;

(g)     Granting Plaintiffs and the Class the costs of this suit, including reasonable attorneys' fees;

(h)     Granting pre-and-post judgment interest; and

(i)     Granting such other and further relief as the Court may deem necessary and proper.


DATED: January 17, 2013

                                      *Gregory K. Arenson*

Gregory K. Arenson
Richard J. Kilsheimer
Elana Katcher
**KAPLAN FOX & KILSHEIMER LLP**
850 Third Avenue, 14th Floor
New York, N.Y. 10022
Telephone:  (212) 687-1980
Fascimile:  (212) 687-7714
rkaplan@kaplanfox.com
garenson@kaplanfox.com
rkilsheimer@kaplanfox.com
ekatcher@kaplanfox.com


Jeffrey C. Block
Whitney E. Street
Mark A. Delaney
**BLOCK & LEVITON LLP**
155 Federal Street, Suite 1303
Boston, MA 02110
Telephone:  (617) 398-5600
Fascimile:  (617) 507-6020
Jeff@blockesq.com
Whitney@blockesq.com
Mark@blockesq.com


22